## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

PAMELA K. WOODS                         )
      Plaintiff,                     )
                                )
      v.                             )    CAUSE NO.: 4:04-CV-63-PRC
                                )
JO ANNE B. BARNHART,                    )
Commissioner of the Social Security     )
Administration,                         )
      Defendant.                     )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Pamela K. Woods, on September 9, 2004, and a Brief in Support of Complaint [DE 14], filed by Ms. Woods on January 13, 2005. Ms. Woods seeks judicial review of a final decision of the Defendant, the Commissioner of the Social Security Administration ("Commissioner"), in which Ms. Woods was denied Disability Insurance Benefits under Title II of the Social Security Act. For the following reasons, the Court denies Ms. Woods' request to reverse and remand the decision of the Commissioner.

## PROCEDURAL BACKGROUND

On April 10, 2002, Ms. Woods filed an application for a period of disability and disability insurance benefits alleging disability as of February 25, 2002, due to rheumatoid arthritis, fibromyalgia, carpal tunnel syndrome, and osteoarthritis of the hands, fingers, arms, knees, and feet. The application was denied initially on July 11, 2002, and upon reconsideration on February 11, 2003. Ms. Woods then filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The hearing before ALJ Peter Americanos was conducted on January 22, 2004, in

Indianapolis, Indiana.  At the hearing, testimony was heard from Vocational Expert Constance Brown ("VE") and Richard Hutson, M.D, a Medical Expert.  On April 6, 2004, the ALJ issued a decision, finding that Ms. Woods was not disabled because she retained the residual functional capacity ("RFC") to perform a modified range of light work[1] and remained capable of performing her past relevant work as well as a significant number of jobs in the economy.  The ALJ considered Ms. Woods' age, education, past work experience, RFC, and the testimony of the VE, in making the following findings:

(1)     The claimant met the disability insured status requirements of the Act on February 25, 2002, the date that the claimant stated she became unable to work, and continues to meet them through at least December 2005.

(2)     The claimant has not engaged in substantial gainful activity since February 25, 2002.

(3)     The medical evidence establishes that the claimant has severe carpal tunnel syndrome, arthritis, fibromyalgia, and the residuals from a right shoulder injury but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

(4)     Evaluation pursuant to Social Security Ruling 96-7p and the implementing Regulations at 20 CFR 404.1529 indicates that the evidence on the record as a whole does not support the claimant's subjective complaints to the extent alleged.

(5)     The claimant is restricted to performing light work.  She could perform no more than occasional squatting, kneeling, stooping, bending, and crawling. She could not climb ropes, ladders, and scaffolds (20 CFR 404.1545).

(6)     The claimant is able to perform her past relevant work as a video store clerk, a waitress, a secretary, and a receptionist.

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

(7)     The claimant is fifty-two years old, which is defined as closely approaching advanced age (20 CFR 404.1563).

(8)     The claimant has more than a high school education (20 CFR 404.1564).

(9)     The claimant has acquired work skills (20 CFR 404.1568).

(10)    Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 and Rule 202.15, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

(11)    The claimant remains capable of performing jobs that exist in significant numbers in the national economy.  These include bookkeeping clerk (1,700 positions in the Indiana economy), stock and inventory clerk (4,000 positions in the Indiana economy), and traffic and record clerk (4,000 positions in the Indiana economy).  A person with the claimant's characteristics could also work as sedentary assembler (approximately 11,000 positions in the Indiana economy), a sedentary bookkeeping clerk (approximately 1,730 positions in the Indiana economy, and a sedentary production inspector (approximately 1,300 positions in the Indiana economy).

(12)    The above-cited rule provides a framework for finding that the claimant is not disabled.

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e) and (f)).

R. at 20-21.

On June 4, 2004, Ms. Woods filed a Request for Review of Hearing Decision with the Appeals Council, which denied reversal or remand on July 29, 2004.  Therefore, the ALJ's decision of April 6, 2004, is the final decision of the Commissioner.

A Complaint for Judicial Review was timely filed by Ms. Woods with this Court on September 9, 2004.  On January 3, 2005, Ms. Woods filed an Opening Brief.  On February 16, 2005, the Commissioner filed a Defendant's Memorandum in Support of Commissioner's Decision.  The

Commissioner also filed a Supplement to the Social Security Administrative Record.  Ms. Woods then filed a Reply Brief in Support of Complaint on February 28, 2005.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A.  Background Information

Ms. Woods was born on April 4, 1952, and was 52 years old at the time of the ALJ's decision. Ms. Woods has completed high school and one year of college.  During Ms. Woods' past relevant work history, she worked as a video store clerk, a waitress, a car wash worker, a secretary, and a receptionist.

### B.  Medical Evidence

*1. Carpel Tunnel Syndrome*

John Gossard, M.D., saw Ms. Woods on March 29, 2000, for complaints of pain and numbness in both hands for several years.  Ms. Woods reported that her hands bothered her and became numb when doing repetitive activities such as driving or typing.  The pain was not only in her hands, but continued up into her forearms.  Dr. Gossard noted that the thumb and index finger of Ms. Woods' hands were mainly involved and reported a positive Tinel's sign upon tapping the median nerves at the wrist and a positive Phalen's test.  Although Ms. Woods had undergone three Cortisone injections in the carpal tunnels, they had only given her temporary relief.  Dr. Gossard

then discussed carpal tunnel and right long trigger finger release surgery with Ms. Woods, which Ms. Woods underwent the following week on April 5, 2000. About a week after the surgery, Ms. Woods reported that, in general, her hands felt better as they did not bother her at night and they were not numb. Dr. Gossard reported that Ms. Woods was able to fully extend her fingers and flex them so that her fingertips could touch the palms of her hands and the sensation was intact in all digits. Dr. Gossard asked Ms. Woods to exercise her fingertips during the day and to do light exercises.

A progress report two weeks later on April 27, 2000, showed that Ms. Woods was doing well with both hands. Dr. Gossard reported that there was some expected tenderness in the scars but that there was no swelling. Ms. Woods demonstrated full mobility of her digits, her sensation was considered normal, and she had no triggering of her right long finger. Ms. Woods reported that she was satisfied with the progress of her hands.

On October 10, 2000, Ms. Woods went to Dr. Gossard for a follow-up visit. The progress report revealed that, although Ms. Woods was experiencing normal sensation and that there was no triggering of the ring finger, Ms. Woods was still experiencing pain from the wrists up to the shoulders. Ms. Woods further reported loss of wrist flexion. Dr. Gossard noted that Ms. Woods' tests for rheumatoid arthritis and x-rays were normal. Physical examination showed tenderness over the first dorsal compartments on both wrists. Ms. Woods had a positive Finkelstein's test, and Dr. Gossard noted that she may have mild DeQuervain's syndrome. Dr. Gossard reported that the sensation was normal in the digits and there was full motion. Further, Ms. Woods showed normal rotation of the forearm and exhibited wrist extension at 35 degrees and flexion at 40 degrees on both sides. Although Ms. Woods was complaining of pain, Dr. Gossard stated that he did not have a good

explanation for the pain because the examination was essentially normal except for the mild DeQuervain's syndrome. Ms. Woods also admitted to being nervous. Dr. Gossard recommended that Ms. Woods do a series of grip strengthening exercises and overhead rope and pulley exercises for five minutes in the morning and five minutes in the evening. Dr. Gossard also recommended that for pain, Ms. Woods only take simple analgesics.

*2. Rheumatoid Arthritis/Fibromyalgia*

Ms. Woods saw Robert A. McKissick, M.D., on January 8, 2001, for complaints of pain in her hands and arms. Due to the pain, Ms. Woods reported that she had trouble sleeping at night. Upon examination, Dr. McKissick reported that Ms. Woods had pain in all of her joints and some hypertrophy of the joints of her hands and wrists, with a decreased range of motion of the wrists and shoulder. Ms. Woods also reported pain abducting the shoulder more than about ninety degrees, as well as pain in her hips and knees. Dr. McKissick's assessment was "osteoarthritis–as near as I can tell." R. at 222. Dr. McKissick then prescribed medication and asked her to return in about month.

During the follow-up visit on February 5, 2001, Dr. McKissick's assessment was that Ms. Woods' osteoarthritis was improving, but not completely better. Dr. McKissick observed some crepitance in the right knee and particularly below the knee cap. Ms. Woods reported that, although there was some swelling in her hands, the pain was less and she was feeling a little better.

On March 29, 2001, Ms. Woods again visited Dr. McKissick and complained of pain in her knees. Upon examination, there was no swelling of either knee, but Ms. Woods had some pain when the knee caps were moved around. Dr. McKissick's assessment was that Ms. Woods had osteoarthritis of the knees and possibly fibromyalgia rheumatica. A follow-up visit two weeks later on April 12, 2001, showed that Ms. Woods' Rhuematoid Arthritis ("RA") factor was negative and

her erythrocyte sedimentation rate was a 26.  Dr. McKissick reported that Ms. Woods was doing much better.

On April 12, 2001, Dr. McKissick noted that Ms. Woods was not feeling as good as she was initially with the medication.  He also observed deformity of the hands.

Ms. Woods saw Dr. McKissick again on April 30, 2001.  Ms. Woods reported that she was still having pain, and Dr. McKissick gave a diagnosis that Ms. Woods had "[p]ossible polymalgia rheumatica or some sort of a generalized arthralgia."  R. at 224.  Dr. McKissick prescribed additional medication.

On June 21, 2001, Elizabeth Droege, M.D., examined Ms. Woods.  At the visit, Ms. Woods complained of pain all over, especially in her lower back.  Ms. Woods complained of tenderness to every part of her body and demonstrated "magnification of symptoms throughout the examination." R. at 225.  Upon her arrival to the doctor's office, Ms. Woods experienced a syncope episode; however, Ms. Woods noted that she had not recently passed out.  An examination of Ms. Woods' left knee showed no locking; however, because of pain, Ms. Woods was unable to allow much motion.  Ms. Woods demonstrated good muscle strength, and Dr. Droege noted that Ms. Woods' EKG was unremarkable.  X-rays of Ms. Woods' lumbar spine showed that the vertebral heights and alignment were normal and some mild interdiscal space narrowing at L5-S1.  Ms. Woods' sedimentation rate was 37.  Dr. Droege instructed Ms. Woods to follow up in three weeks with Akram Al-Makki, M.D.

Ms. Woods saw Dr. Al-Makki, on July 10, 2001, for complaints of pain all over her body. Dr. Al-Makki reported that Ms. Woods' range of motion of her extremities was normal and there was no evidence of edema or synovitis.  Ms. Woods demonstrated positive tender points of the

trapezius muscle, lumbar area, knees, elbows, anterior thoracic area, and occipital area.  Dr. Al-Makki's diagnosis was fibromyalgia, osteoarthritis, hypertension, and depression.  On August 7, 2001, Dr. Al-Makki examined Ms. Woods again and gave her the same diagnosis.

On September 11, 2001, Ms. Woods presented for a follow-up visit with Dr. Al-Makki.  Dr. Al-Makki found positive tender points in multiple areas including the trapezius muscle, lumbar area, knees, elbows, anterior thoracic area, and occipital area.  He diagnosed hypertension and osteoarthritis.  Dr. Al-Makki offered to refer Ms. Woods to a rheumatologist, but she declined.

On November 5, 2001, Ms. Woods had a sedimentation rate of 48.

Due to pain, Ms. Woods had a sonogram of her pelvis on February 18, 2002.  The results of the sonogram were essentially normal.

*3. Consultative Examination*

On June 8, 2002, Ms. Woods saw R. Newton, M.D., for a consultative examination.  At the outset of the examination, Dr. Newton recognized a history of diagnosed rheumatoid arthritis, osteoarthritis, carpel tunnel syndrome, and fibromyalgia.  At the examination, Ms. Woods was in no acute distress, was able to get on and off the examination table without difficulty or assistance, demonstrated normal gait without assistance, was able to walk on her toes and heels without difficulty, and was able to bend all the way over and get back up without difficulty.  Ms. Woods did not have any tenderness to palpation of the spine, nor was there any evidence of inflammation, effusion, or swelling of any of the joints tested.  Ms. Woods' extremities were free from clubbing and cyanosis.  Ms. Woods' straight-leg raising test was negative for radicular symptoms bilaterally.  Neurologically, Ms. Woods' cranial nerves were intact and the sensory exam was symmetrical and

normal.  Ms. Woods demonstrated 5/5, the equivalent of normal, motor strength in all muscle groups tested and her deep tendon reflexes were symmetric and normal.  Ms. Woods' grip strength was 5/5 and her fine finger movements were normal.  Dr. Newton's assessment was "[p]ain in shoulder, wrists, hands, ankles, knees and feet secondary to Rheumatoid and osteoarthritis."  R. at 218.  Dr. Newton then recommended that Ms. Woods see a rheumatologist.

### 4. Right Shoulder Pain

On June 20, 2003, Ms. Woods was involved in a motor vehicle accident in which she struck the steering wheel with her right shoulder.  At the emergency room, Ms. Woods complained of neck and right shoulder pain.  An examination showed that she had a limited range of motion of her right shoulder.  The x-rays were normal for the right shoulder and the cervical spine.  The attending physician diagnosed neck sprain and right shoulder sprain, prescribed an anti-inflammatory and a muscle relaxant, and discharged Ms. Woods in stable condition.

On June 23, 2003, Ms. Woods saw Dr. Al-Makki for follow-up of the motor vehicle accident.  She complained of having a lot of muscle pain all over, especially in her neck and shoulder.  Upon examination, Ms. Woods was in no acute distress and her extremities showed no edema, but a musculoskeletal examination revealed positive tenderness over her trapezius muscles and neck muscles.  Dr. Al-Makki diagnosed Ms. Woods with muscle spasm, and he prescribed a course of physical therapy.  Ms. Woods underwent physical therapy from June 2003 through December 2003.

On July 8, 2003, Ms. Woods complained of neck pain and headache, reporting being depressed since the accident.  A neurological examination showed no focal deficits, and a

musculoskeletal examination revealed tenderness to palpation over her neck and trapezius muscles. Dr. Al-Makki diagnosed Ms. Woods with neck pain, headache, and depression.

An MRI of Ms. Woods' cervical spine on July 10, 2003, showed mild localized spondylosis at C5-6 but no neural impingement.  The MRI was within the normal range for a patient of Ms. Woods' age.

On July 22, 2003, Ms. Woods reported to Dr. Al-Makki that she was feeling a little better, as her neck pain was improving and her headache was nearly gone.  Dr. Al-Makki indicated that the MRI of Ms. Woods' head was negative and that the MRI of her cervical spine showed mild localized cervical spondylosis.  Upon physical examination, Ms. Woods' extremities showed no edema.  A musculoskeletal examination revealed tenderness to palpation over the back of Ms. Woods' neck and her trapezius muscles, but was otherwise unremarkable.

On July 25, 2003, Ms. Woods told her physical therapist that she was feeling better.  On August 11, 2003, Ms. Woods told her physical therapist that her shoulder felt sore because she went rafting over the weekend and had to paddle a little bit.

On August 19, 2003, Ms. Woods reported that she continued to have a pinching in her shoulder with range of motion.  Dr. Al-Makki referred Ms. Woods to Dr. Hagen.

On August 28, 2003, Angela Wood, a physical therapist, reported that Ms. Woods made gradual progress during her first month of treatment, but that she began to plateau during her second month.  Ms. Wood put Ms. Woods' therapy on hold until she had an orthopedic consultation.

On August 29, 2003, Ms. Woods saw Dr. Robert J. Hagan, M.D. for an evaluation of her right shoulder and neck.  Ms. Woods complained of right shoulder pain that occasionally radiated into her arm.  A physical examination revealed a good range of motion of Ms. Woods' neck and

shoulders.  Dr. Hagan reported that there was good strength to internal and external rotation of Ms. Woods' right shoulder and a positive impingement sign.  Sensory and motor examinations were normal.  Dr. Hagan reported that x-rays of Ms. Woods' right shoulder and lateral cervical x-rays showed no displaced fractures.  Dr. Hagan noted that Ms. Woods' MRI did not show a major problem with her neck and indicated that he wanted to obtain a second MRI.

An MRI of the right shoulder on September 4, 2003, showed a near full thickness tear of the suprasinatus tendon.

In a letter to Dr. Al-Makki dated September 10, 2003, Dr. Hagan reported that Ms. Woods continued to have problems with her shoulders, but that she had good strength and that the MRI showed a significant rotator cuff tear.  Dr. Hagan suggested that Ms. Woods see a physcial therapist to see if that might help her shoulder, as he opined that there was a 50/50 chance that therapy would help her.  Otherwise, Dr. Hagan indicated that surgery would be an option.

On September 11, 2003, Ms. Woods reported that she wanted to try some different things in physical therapy for another month.  Ms. Robinson noted that Ms. Woods' MRI showed a tear of her right rotator cuff and stated that Ms. Woods would benefit from therapeutic exercises.

Ms. Woods saw Dr. Al-Makki for follow-up on September 22, 2003, and she reported that she was still having right shoulder pain.  Upon examination, Ms. Woods was in no acute distress and her extremities revealed no edema, but she had a limitation of motion of her right shoulder.  Dr. Al-Makki diagnosed Ms. Woods with depression, hypertension, and right shoulder pain.

On October 8, 2003, Dr. Hagan did a rotator cuff debridement, a subacromial decompression, and resection of the distal clavicle right shoulder.

On November 12, 2003, Dr. Hagen reported that Ms. Woods was doing very well with her shoulder, as she demonstrated good motion on examination. Dr. Hagan stated, "She and I are very happy with the progress she has made." R. at 91.

On November 17, 2003, Ms. Woods reported her right shoulder was feeling pretty good.

On December 4, 2003, muscle strength in Ms. Woods' shoulder was rated from 4/5 to 5/5. Ms. Wood discharged Ms. Woods from physical therapy. The goals of reducing the worst pain to 5/10 and of preparing Ms. Woods to a home exercise program were met.


### C.  Reviewing Physician Opinion

On July 3, 2002, Dr. Klion, Ph.D., a State Agency psychologist, reviewed the evidence of record and opined that Ms. Woods did not have a severe mental impairment.

On July 9, 2002, J. Gaddy, M.D., a State Agency physician, reviewed the evidence of record and opined that Ms. Woods could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, stand about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was unlimited in her ability to push and/or pull with her extremities. Dr. Gaddy also opined that Ms. Woods could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could not climb ladders, ropes, and scaffolds. In addition, Dr. Gaddy opined that Ms. Woods was limited in her ability to reach overhead. On March 4, 2003, F. Montoya, M.D. affirmed Dr. Gaddy's opinion.

On March 5, 2003, D. Unversaw, Ph.D., a State Agency psychologist, reviewed the evidence of record and opined that Ms. Woods did not have a severe mental impairment.

### D.  Testimony of the Medical Expert

At the hearing, Dr. Hutson testified that, as an orthopedic surgeon with thirty-five years of experience, he is an expert in the area of soft tissue problems, including fibromyalgia.  Dr. Hutson first acknowledged Ms. Woods' two surgeries and her recovery from each.  He then testified that, based upon the medical record before him, he had "no idea" where the diagnosis for rheumatoid arthritis came from.  R. at 283.  He noted that Dr. Newton had recognized a prior diagnosis of fibromyalgia and also noted the tender points that Dr. Al-Makki observed.  Dr. Hutson further discussed the records of Dr. McKissick.  He explained that, although the record showed that Ms. Woods had high sedimentation rates on different occasions, "[s]edimation rate can be elevated if you have a cold, if you have a viral infection, if you have arthritis in your joints.  It just simply means that there is increased activity in that particular phase of the body's healing process.  So it's a very non-specific test."  R. at 288. He further opined that Dr. Newton, the consultative examiner, would have been looking for signs of fibromyalgia and joint pain because, in the section on history of present illness in his report, Dr. Newton listed rheumatoid arthritis, osteoarthritis, carpal tunnel syndrome, and fibromyalgia as Woods' present self-reported illnesses.  Ultimately, Dr. Hutson testified that Ms. Woods did not meet any listing impairments based upon the evidence of record and opined that Ms. Woods retained the RFC to perform light work.

### E.  Testimony of Vocational Expert

VE Brown testified that Ms. Woods had "skills that can provide direct entry into skilled work" and that the "skills that she obtained as an administrative medical assistant would provide for

direct entry" into a number of jobs including medical receptionist, scheduler, and record keeper.  R. at 293.

The ALJ asked VE Brown "to assume a hypothetical individual of claimant's age, education and work experience, who can do work at the light level but has the following limitations.  That individual can do no more than occasional bending, squatting, kneeling, stooping and crawling, and that individual cannot climb ropes, ladders, scaffolds, and the like."  R. at 293.  The ALJ asked if such an individual could perform any of Ms. Woods' past work.  VE Brown testified that such an individual could perform Ms. Woods' past work, including her work as a video store clerk, a waitress, a secretary, and a receptionist.

VE Brown also testified that such a hypothetical individual, with the additional limitations that the environment be free of noxious fumes, gases, respiratory irritants, extremes of temperature and humidity and that the individual can do no more than superficial interaction with the public, coworkers, and supervisors, would be able to perform other jobs in the region including bookkeeping and auditing clerks, of which there are about 1,730 jobs in the region; stock and inventory clerks, of which there are about 4,000 jobs in the region; and traffic, shopping, and receiving clerks of which there are about 4,000 jobs in the region.  She further testified that the bookkeeping and auditing clerk jobs she identified are performed at the sedentary exertional level.  In addition, she noted that there would be about 11,000 sedentary, unskilled assembler jobs such an individual could perform, as well as about 1,300 sedentary production inspector jobs.  She verified that her testimony was consistent with the information contained in the Dictionary of Occupational Titles.

Finally, VE Brown testified that, if the ALJ were to credit Ms. Woods' testimony about her hands with the limitations she gave such as trouble typing, holding the mouse, etc., none of the above jobs would remain.

### F.  Testimony of the Plaintiff

At the hearing, Ms. Woods testified that she cannot sit for too long at a time.  When she gets up, she is stiff, her knees hurt, and her feet swell.  This causes her not to be able to do anything repetitive for very long.  She gave the example of typing, which causes her hands to cramp up.  She also explained that she cannot hit the keys on the computer keyboard with her fingers like she used to be able to since she had surgery for her carpel tunnel.  If she does type, her hands and arms get very sore.  Ms. Woods testified that she can only raise her right arm to a certain height as a result of her rotator cuff injury.  She also testified that she has pain in her arms, hands, knees, and feet and swelling in her fingers, knees, elbows, shoulders, and feet.  As for her feet, the bottoms hurt when she walks, and her toes are so sensitive that it hurts her to put shoes on or bend her toes.  She testified that her doctor told her all these pains are part of her rheumatoid arthritis.  She explained that it is the arthritis and fibromyalgia that cause her pain and that she never knows where she will experience the pain in her body.  She stated that she has even had pain in her chest, as a result of anxiety.

At the time of the hearing, Ms. Woods was taking Tylenol Arthritis for her pain, although she had taken Celebrex, Vioxx, Tylenol, and Aleve in the past for the pain.  She testified that her pain was an eight on a scale of one to ten when taking the Tylenol Arthritis.  She also had Darvocet,

which she only took once a day, and Vicodin, which she tried to avoid because of its addictive nature.

Ms. Woods testified that she can sit for fifteen minutes at a time, that she could stand for seven minutes at a time, and that she could walk less than a block. She cannot lift a half gallon of milk with one hand, but she could lift a package weighing two pounds with both hands. She also cannot button buttons and testified that it would be difficult for her to pick up coins from a table. Ms. Woods testified that she drives to the bank a few times a week, which is eight miles from her home, but that she would not be able to drive twenty miles. When she goes shopping, she is either pushed in a wheelchair or she uses a rider wheelchair because she cannot complete her shopping by walking. Ms. Woods separates the laundry, but her son and husband do the laundry. She testified that she can walk up the stairs one step at a time by holding onto a bar, but that she cannot walk down the steps because of her knees. She has trouble holding onto things and has difficulty opening doors with knobs.

### G. The ALJ's Decision

The ALJ found that Ms. Woods was capable of performing a modified range of light work. After comparing her RFC with the requirements of her past work, the ALJ determined that Ms. Woods was not under a disability, as defined under the Act, because she remained capable of performing her past relevant work as a video store clerk, a waitress, a secretary, and a receptionist. In addition, considering Ms. Woods' age, education, past work experience, RFC, and the uncontradicted testimony of the VE, the ALJ concluded at step five that Ms. Woods was capable of performing a significant number of jobs in the economy.

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.  *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard.  *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).  If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings."  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A).  To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. §§ 423(d)(2)(A); 20 C.F.R. §§ 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4).  The Seventh Circuit has summarized the sequence as follows:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [his] past relevant work; and (5) whether the claimant is capable of performing work in the national economy.  Under the five-part sequential evaluation process, "[a]n affirmative answer leads either to the next step, or, on Step 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."  If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations omitted) (alterations in original); *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).  At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.  "The RFC is an assessment of what work-related activities the claimant can perform despite [his]

18

limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski*, 245 F.3d at 888.  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### ANALYSIS

In her Brief, Ms. Woods argues that the ALJ's decision is not supported by substantial evidence and is contrary to law, regulations, and the Social Security Rulings.  Specifically, Ms. Woods argues that the ALJ did not properly evaluate her fibromyalgia impairment because he listed it as severe at step two of the disability analysis but did not add any restrictions to her RFC due to that impairment.  Ms. Woods requests that the Court set aside the ALJ's decision and that her claim

for a period of disability and disability insurance benefits be allowed or, in the alternative, that the

Court remand this case to the ALJ for a fair hearing.  In response, the Commissioner contends that

the ALJ's RFC finding is supported by substantial evidence of record because the medical evidence

fails to support Ms. Woods' allegations of disability, the ALJ properly weighed the medical source

opinion evidence of record, substantial evidence supports the ALJ's finding that Ms. Woods'

subjective complaints were not fully credible, and substantial evidence supports the ALJ's finding

that Ms. Woods can perform her past work.


### A.  Substantial Evidence

The only disability that Ms. Woods has placed at issue on appeal is her fibromyalgia.

"[F]ibromyalgia is not always (indeed, not usually) disabling."  *Estok v. Apfel*, 152 F.3d 636, 640

(7th Cir. 1998) (citing *Sarchet*, 78 F.3d at 307).  Indeed, "[s]ome people may have such a severe

case of fibromyalgia as to be totally disabled from working, but most do not and the question is

whether [Ms. Woods] is one of the minority."  *Sarchet*, 78 F.3d at 306-07 (7th Cir. 1996) (internal

citations omitted).   The court in *Sarchet* explained:

> [Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest
> importance to disability law, its symptoms are entirely subjective.  There are no
> laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms
> are "pain all over," fatigue, disturbed sleep, stiffness, and–the only symptom that
> discriminates between it and other diseases of a rheumatic character–multiple tender
> spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the
> patient must have at least 11 of them to be diagnosed as having fibromyalgia) that
> when pressed firmly cause the patient to flinch.  All these symptoms are easy to fake,
> although few applicants for disability benefits may yet be aware of the specific
> locations that if palpated will cause the patient who really has fibromyalgia to flinch.

*Id*. at 306-07.  The substantial evidence of record, including the objective medical evidence, the

clinical medical findings, and the testimony of record, supports the ALJ's RFC determination that

20

Ms. Woods could return to her past work and perform other work in the economy; the ALJ sufficiently articulated his reasoning so as to build a logical bridge between the evidence and his decision; and Ms. Woods has not identified any evidence of record suggesting that she is, in fact, one of the minority who is totally disabled from working due to fibromyalgia.

In his decision, the ALJ recognized that Ms. Woods has a combination of severe impairments, which include carpal tunnel syndrome, arthritis, fibromyalgia, and residuals from a right shoulder injury.  However, he reasoned that "her severe and non-severe impairments, singly or in combination are not so severe that they are attended by medical signs or laboratory findings that meet or equal in severity any impairment contained in the Listing of Impairments."  R. at 15. At step four of the analysis, the ALJ considered the specific objective medical evidence, the medical opinions of record, and Ms. Woods' subjective complaints to determine that she is capable of returning to her past relevant work.

In this analysis, the ALJ fully recognized and set forth the history of all her ailments, including her history of bilateral carpal tunnel syndrome and the successful surgery; pneumonia and its successful treatment; the consultative examination of Dr. Newton; treatment of gastritis; a fall in October 2002 from which Ms. Woods sustained rib fractures, which healed; and a motor vehicle accident on June 20, 2003, during which Ms. Woods sustained a right shoulder and neck injury, which was followed by a course of physical therapy and surgery to repair a right supraspinatus tendon tear.  The ALJ noted that during the consultative examination with Dr. Newton, Ms. Woods did not use an assistive device and could get on and off the examination table without difficulty, Ms. Woods could walk on her heels and toes without difficulty, Ms. Woods could bend all the way over and get back up without difficulty, the spine was not tender, there was no evidence of inflammation,

effusion, or swelling of any joint, ranges of motion were somewhat reduced in the back, shoulders, wrists, fingers, hips, and knees, muscle strength was normal, hand grip and manual dexterity were normal, and Ms. Woods had normal ability to handle small objects and button. The ALJ recognized that Dr. Newton made an assessment of pain in the shoulders, wrists, hands, feet, ankles, and knees secondary to rheumatoid arthritis and osteoarthritis. The ALJ also noted that the State Agency medical consultants concluded that Ms. Woods has osteoarthritis and rheumatoid arthritis, which restricted Ms. Woods to performing light work.

As for her fibromyalgia and rheumatoid arthritis, the ALJ gave significant weight to the opinion of the testifying expert, Dr. Hutson, who testified that Ms. Woods could perform light work. At the hearing, Dr. Hutson, who is an expert in soft tissue pain, took into account Ms. Woods' fibromyalgia, having reviewed the report of Dr. Al-Makki, which noted his observation of tender points at the trapezius muscle, lumbar area, knees, elbows, anterior thoracic area, and occipital area. Dr. Hutson also observed Ms. Woods during the hearing and listened to her testimony. The ALJ recognized that Dr. Hutson stated that the origin of Ms. Woods' soft tissue pain is unknown and could be related to fibromyalgia. Nevertheless, Dr. Hutson opined that Ms. Woods does not have a condition that meets or equals the criteria for any listing. In his decision, the ALJ reasoned, "Dr. Hutson's opinion is based on a recent and comprehensive review of all the medical evidence. It is consistent with the State Agency opinion and with the objective medical evidence. Dr. Hutson's opinion is highly probative and heavily weighted herein." R. at 17. Dr. Hutson's opinion is consistent with the medical evidence of record. The Court finds that the ALJ gave the proper weight to the testimony of Dr. Hutson. *See* 20 C.F.R. § 404.1527(d)(1)-(6) (setting forth the factors the ALJ must consider when assessing the weight of a medical opinion).

Later in the decision, the ALJ recognized Ms. Woods' testimony regarding that her pain is a nine on a scale of ten without medication and an eight on a scale of ten with medication, that stress aggravates her pain, that her feet and knees hurt with the greatest pain in her arms, hands, feet, and toes, that she has fibromyalgia, that she is unable to bend her toes, and that she has knee and ankle swelling. The ALJ also noted Ms. Woods' physical limitations as she testified to them at the hearing.

The ALJ then discredited Ms. Woods' subjective complaints to the extent alleged, which is discussed more fully below in Part B. Among other things, the ALJ found that Ms. Woods "appears to have exaggerated her disability secondary to her orthopedic impairments." R. at 18. The ALJ then discusses her rheumatoid arthritis, carpal tunnel, and right shoulder injury. As to the fibromyalgia, the ALJ wrote: "Although Ms. Woods may have fibromyalgia, the consultative examination conducted by Dr. Newton indicates that Ms. Woods has only minor limitations secondary thereto." R. at 18. The ALJ then explained: "The claimant's allegations pertaining to weakness and swelling are uncorroborated. Although Ms. Woods alleged that she goes shopping in a wheelchair, there is no medical documentation of a need for a wheelchair, or even that she has a wheelchair. No physician of record has submitted a statement that corroborates the claimant's subjective complaints to the extent alleged. To the contrary, all medical course statements indicate that the claimant retains substantial work capability." R. at 18-19.

Dr. Gaddy and Dr. Montoya, the reviewing physicians, opined that Ms. Woods was restricted to performing light work activities. *See* 20 C.F.R. § 404.1527(f)(2) (providing that the ALJ consider opinions from qualified physicians who are experts in social security disability evaluation). Generally, the more consistent a medical opinion is with the record as a whole, the more weight an

23

ALJ will give to that opinion.  *See* 20 C.F.R. § 404.1527(d)(4).  Here, the ALJ noted that the opinions of Dr. Gaddy and Dr. Montoya were consistent with the objective medical evidence and based on that evidence.

The ALJ has provided a logical bridge between the evidence of record and his decision.  The ALJ recognized Ms. Woods' diagnosis of fibromyalgia and Dr. Hutson's opinion that, even with fibromyalgia, she is still capable of light work, but determined that, considering the record as a whole, her disabilities do not prevent her from performing her past work or other jobs available in the economy.  In light of the minimal medical records, the ALJ conducted a thorough review of the medical evidence of record.  Moreover, the ALJ does not rely solely on Dr. Hutson's opinion in making his determination but also independently considers the evidence of record and the opinions of the other physicians to make the administrative determination of Ms. Woods' RFC.  *See* 20 C.F.R. § 404.1527(e) (providing that the final responsibility for deciding a claimant's RFC is reserved to the Commissioner).

As recognized by the Court in *Sarchet*, fibromyalgia manifests itself in a range of severity.  Dr. Hutson opined that the severity of Ms. Woods' fibromyalgia does not rise to the level of disabling.  It is this opinion on which the ALJ relies, and substantial evidence of record supports the decision.  Dr. Al-Makki, Ms. Wood's treating physician, is the only doctor who made any reference to tender points, and he observed tenderness in the trapezius muscle, lumbar area, knees, elbows, anterior thoracic area, and occipital area on July 10, 2001, and September 11, 2001.  The standard for diagnosing fibromyalgia is eleven of eighteen recognized points.  *See* The American College of Rehumatoloty, 1990 Criteria for the Classification of Fibromyalgia, *available at* http://www.rheumatology.org/publications/classifications/fibromyalgia/fibro.asp?aud=mem (last

24

visited Aug. 1, 2005).[2]   Dr. Al-Makki did not attempt to treat the symptoms of Ms. Woods'

fibromyalgia; rather, he focused on treating the rheumatoid arthritis.  On June 8, 2002, Dr. Newton,

the consulting physician and a rheumatologist, recognized Ms. Woods' self-reported fibromyalgia

in her history of present illness.   However, upon his physical examination of Ms. Woods, Dr.

Newton made no notation as to having identified tender points other than noting that there was no

tenderness to palpation of spine, nor did he ultimately diagnose fibromyalgia himself.  *See*

*Groskereutz v. Barnhart*, No. 03-3666, 2004 WL 1943249 at *3-4 (7th Cir. Aug. 26, 2004)

---

[2] The "1990 Criteria for the Classification of Fibromyalgia" provides:
1. History of widespread pain.
    Definition. Pain is considered widespread when all of the following are present: pain in the left side of the body, pain in the right side of the body, pain above the waist, and pain below the waist. In addition, axial skeletal pain (cervical spine or anterior chest or thoracic spine or low back) must be present. In this definition, shoulder and buttock pain is considered as pain for each involved side. "Low back" pain is considered lower segment pain.
2. Pain in 11 of 18 tender point sites on digital palpation.
    Definition. Pain, on digital palpation, must be present in at least 11 of the following 18 sites:
    Occiput: Bilateral, at the suboccipital muscle insertions.
    Low cervical: bilateral, at the anterior aspects of the intertransverse spaces at C5-C7.
    Trapezius: bilateral, at the midpoint of the upper border.
    Supraspinatus: bilateral, at origins, above the scapula spine near the medial border.
    Second rib: bilateral, at the second costochondral junctions, just lateral to the junctions on upper surfaces.
    Lateral epicondyle: bilateral, 2 cm distal to the epicondyles.
    Gluteal: bilateral, in upper outer quadrants of buttocks in anterior fold of muscle.
    Greater trochanter: bilateral, posterior to the trochanteric prominence.
    Knee: bilateral, at the medial fat pad proximal to the joint line.

    Digital palpation should be performed with an approximate force of 4 kg.
    For a tender point to be considered "positive" the subject must state that the palpation was painful. "Tender" is not to be considered "painful."

* For classification purposes, patients will be said to have fibromyalgia if both criteria are satisfied. Widespread pain must have been present for at least 3 months. The presence of a second clinical disorder does not exclude the diagnosis of fibromyalgia.

Wolfe F, Smythe HA, Yunus MB, Bennett RM, Bombardier C, Goldenberg DL, et al. The American College of Rheumatology 1990 criteria for the classification of fibromyalgia: report of the multicenter criteria committee. Arthritis Rheum 1990;33:160---72.

The American College of Rheumatoloty, 1990 Criteria for the Classification of Fibromyalgia, *available at* http://www.rheumatology.org/publications/classifications/fibromyalgia/fibro.asp?aud=mem (last visited Aug. 1, 2005).

(recognizing that no fewer than three of the plaintiff's doctors diagnosed trigger points sufficient to support a diagnosis of fibromyalgia).  Finally, on July 22, 2003, during a follow-up visit after her June 20, 2003 motor vehicle accident, a musculoskeletal examination by Dr. Al-Makki revealed tenderness to palpation over the back of Ms. Woods' neck and her trapezius muscles, but was otherwise unremarkable.

In *Groskereutz*, the plaintiff suffered from fibromyalgia, and the court found that the opinion of a neutral, vocational evaluator, who had personally observed the plaintiff over several days of testing and who opined that the "chances for success at full time employment, at a competitive pace, on a consistent basis, are predicted to be poor," went to the heart of the plaintiff's disability claim and was in direct conflict with the ALJ's finding that she had the RFC to do light work.  *Id*. at 416, *3.  The court in *Groskereutz* held that the ALJ erred by not discussing the report and explaining, at a minimum, why it was not relevant; the failure to do so constituted legal error.  *Id*.  In contrast, no such unanalyzed report or evidence exists in this case.  The ALJ took into consideration all the medical evidence of record, and no additional documents remain that would support Ms. Woods' claim of greater disability.  Although the evidence of record does support Ms. Woods' assertion that she suffers from fibromyalgia, none of the evidence suggests that she suffers from it at a level that is disabling under the standard.

Finally, in arguing that the ALJ failed to fully understand the "widespread pain" of her fibromyalgia syndrome, Ms. Woods does not suggest what additional limitations the ALJ should have found or what she believes an appropriate RFC would be with the analysis of fibromyalgia that she believes should have taken place.  Pl. Br. at 13.  Ms. Woods does not point to any specific medical evidence or the opinion of any of her treating physicians that support the need for

limitations beyond those identified by the ALJ in his RFC finding.  Nor does Ms. Woods have other medical ailments related to fibromyalgia, such as migraines, that the ALJ failed to address.  *See Indoranto v. Barnhart*, 374 F.3d 470, 473-74 (7th Cir. 2004); *Strickland v. Barnhart*, No. 03-2143, 2004 WL 1873223, *1 (7th Cir. Aug. 19, 2004).  Accordingly, the Court finds that the ALJ's RFC finding of light work is supported by substantial evidence of record.

In addition, the ALJ's determination at step four that Ms. Woods can perform her past relevant work is supported by substantial evidence.  The ALJ determined that Ms. Woods has an RFC for light work.  The ALJ then compared the RFC with the requirements of Ms. Woods' past work and, based on the testimony of the vocational expert, found that she could return to that past work and was not disabled.  *See* 20 C.F.R. § 404.1520(f).  The burden is on the plaintiff to show that she could not perform this past relevant work at step four.  *See Knight*, 55 F.3d at 313; *Bowen v Yuckert*, 482 U.S. 137, 146 n.5 (1987).  Ms. Woods' past work included work as a video store clerk, a waitress, a secretary, and a receptionist, which VE Brown testified are performed at the light and sedentary exertional levels.  Accordingly, the ALJ determined that Ms. Woods, with an RFC for light work, was able to perform her past relevant work because it is performed at the light or sedentary levels.  When the restrictions of an environment free from "noxious fumes, gases, respiratory irritants, extremes of temperatures and humidity, and that the individual can do no more than superficial interaction with the public, coworkers and supervisors" were added, VE Brown testified that Ms. Woods would be able to perform other jobs including bookkeeping and auditing clerk, which could be performed at the sedentary level, and inventory clerk and traffic, shipping, and receiving clerks, which are performed at the light level.  R. at 294.  Notably, Ms. Woods does not challenge the ALJ's finding, at step five, that Ms. Woods could perform a significant number of jobs

in the economy.  The Court finds that the ALJ's findings at steps four and five are in accordance with Ms. Woods' RFC for light work and the substantial evidence of record.

## B.  Credibility Determination

Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work.  20 C.F.R. §§ 404.1529(a).  However, subjective allegations of disabling symptoms alone cannot support a finding of disability.  20 C.F.R. §§ 404.1529(a).  The Social Security regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability:  (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.  20 C.F.R. §§ 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

The ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3).  In making the credibility determination, Social Security Ruling 96-7p

dictates that the ALJ "must consider the entire case record, including the objective medical evidence,

the individual's own statements about symptoms, statements and other information provided by

treating or examining physicians or psychologists and other persons about the symptoms and how

they affect the individual, and any other relevant evidence in the case record."  SSR 96-7p at *1.

The Ruling provides that the "determination or decision must contain specific reasons for the finding

on credibility, supported by the evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight."  SSR 96-7p; *see Steele v. Barnhart*, 290

F.3d 396, 942 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887.

Moreover, an ALJ is not required to give full credit to every statement of pain or to find a

disability every time a claimant states that he or she is unable to work.  *Rucker v. Chater*, 92 F.3d

492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding

symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because

they are not substantiated by objective evidence."'  SSR 96-7p at *6.

"[T]he adjudicator may also consider his or her own recorded observations of the individual

as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-7p.  As

the Seventh Circuit has stated, "[B]ecause hearing officers are in the best position to see and hear

the witnesses and assess their forthrightness, we afford their credibility determinations special

deference."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal quotations and citations

omitted).  Generally, an ALJ's credibility determination will not be overturned unless it was

"patently wrong."  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

29

Although Ms. Woods generally suggests that the ALJ did not properly evaluate the credibility of her subjective complaints, Ms. Woods makes no argument under the regulations as to which factors she believes the ALJ ignored. *See* 20 C.F.R. § 404.1529; SS Ruling 96-7p. However, as set forth in detail in Part A above, the ALJ thoroughly considered the medical evidence of record and evaluated Ms. Woods' testimony in light of that record. The ALJ recognized his responsibility to consider all the factors relating to Ms. Woods' disability under § 404.1529 and then allotted two full paragraphs to identifying the conflicts in the record between the medical evidence and Ms. Woods' subjective complaints of pain. The ALJ noted that Ms. Woods' "allegations pertaining to weakness and swelling are uncorroborated," R. at 18, and that "[n]o physician of record has submitted a statement that corroborates the claimant's subjective complaints to the extent alleged. To the contrary, all medical source statements indicate that the claimant retains substantial work capability," R. at 19. Moreover, the ALJ gave significant weight to the testimony of Dr. Hutson, with years of experience treating soft tissue pain, and Dr. Hutson found that the evidence of record did not support Ms. Woods' complaints and that she could perform light work.

The ALJ also considered Ms. Woods' daily activities and found that they were not consistent with her complaints of disabling pain, observing that she "gets along with family, friends, and the public. She cooks, does laundry, and cleans. She remembers doctor's appointments. The claimant follows directions, instructions, and conversations without problem. She is able to drive three or more times each week." R. at 17. Ms. Woods testified that she separates the laundry, attends church, visits with friends at her home, goes out to lunch with her mother, reads newspapers and magazines, watches television, and feeds her fish. She uses a motorized cart or a wheelchair when shopping. Ms. Woods further testified that she has difficulty picking up change, cannot snap or

button clothes, and has difficulty turning door knobs, but the record also demonstrates that Ms. Woods wears contact lenses and that Dr. Newton reported that she could handle small objects and button.  By considering Ms. Woods' daily activities, the ALJ specifically considered the effect of Ms. Woods' complaints of widespread pain on her ability to function on a day-to-day basis.

Finally, the ALJ acknowledged Ms. Woods' prescription and nonprescription medications. *See* 20 C.F.R. § 404.1529(c)(3)(iv).  After noting that Aleve appears to have caused Ms. Woods to suffer from gastritis but that a medication change relieved the symptoms, the ALJ recognized that "[a]lthough [Ms. Woods] may be experiencing some degree of depression and anxiety, she appears to be well maintained on her medications."  R. at 17.  As observed by the ALJ, Ms. Woods testified that she was taking over-the-counter medications including Tylenol and ibuprofen, which help her pain.  The record does not show that she is under any continuing care for her pain with treatments such as physical therapy, epidural injections, or stronger medication.  Nor did Ms. Woods testify that she takes any steps at home to seek relief from her pain such as hot baths, lying down, heating pads, or ice packs.  *See Indoranto*, 374 F.3d at 474-75 (reversing the ALJ, in part, because the ALJ failed to articulate his rationale for discrediting the plaintiff's testimony about using frequent hot baths and lying down to relieve her pain).

Accordingly, the Court finds that the ALJ adequately weighed Ms. Woods' subjective complaints of pain with the objective medical evidence and the medical opinions of record and considered the  factors set forth in 20 C.F.R. § 404.1529.  The ALJ considered the entire case record and articulated specific reasons for his credibility finding.  Finally, the ALJ was in the best position to make the credibility determination because he, as well as Dr. Hutson on whom he relied, observed Ms. Woods during the hearing.  Ms. Woods has not demonstrated nor does the Court find that the

ALJ's credibility determination is "patently wrong," and the Court will not reverse the credibility determination.  *See Jens*, 347 F.3d at 213.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination at steps four and five of the sequential disability analysis was supported by substantial evidence.  Therefore, the Court **DENIES** the Brief in Support of Complaint [DE 14].  The Court **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 5th day of August, 2005.


s/ Paul R. Cherry_____
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record